[No. 43492.    En Banc.    November 26, 1975.]

SEATTLE-FIRST NATIONAL BANK, *Respondent*, v. T. E. TABERT,
ET AL, *Defendants*, VOLKSWAGEN OF AMERICA, INC.,
*Appellant*.

**146**

*Charles T. Schillberg* and *Ken Earl*, for appellant.

*Wolf, Hackett, Beecher & Hart* and *A. R. Hart*, for respondent.

*Martin T. Crowder* (of *Karr, Tuttle, Koch, Campbell, Mawer & Morrow*), amicus curiae, on behalf of Washington Association of Defense Counsel; *Daniel F. Sullivan* and *Gregg L. Tinker*, amici curiae, on behalf of Washington State Trial Lawyers' Association; *Howard P. Pruzan* (of *Miracle, Pruzan & Nelson*), amicus curiae.

BRACHTENBACH, J.—Plaintiff alleges a claim against the importer of a Volkswagen microbus, founded solely on strict liability, contending that a design defect either caused or enhanced the injuries to the driver and passenger, resulting in their deaths. The trial court granted a summary judgment for defendant. The Court of Appeals reversed, *Seattle-First Nat'l Bank v. Volkswagen of America, Inc.*, 11 Wn. App. 929, 525 P.2d 286 (1974). We affirm the Court of Appeals.

Plaintiff sues as administrator of the estates of a husband and wife who were killed when the Volkswagen microbus, being driven by the husband in which the wife was a passenger, collided with the rear of a flatbed truck. The microbus is a snub-nosed type van with the driver and passenger sitting very close to the front panel of the vehicle. By affidavit in opposition to the summary judgment motion, plaintiff's expert concluded that the collision occurred at a relative speed of less than 20 miles per hour. That affidavit alleged that the defect was the lack of structural integrity in the front panel so that if the vehicle collided with a solid object at 10 miles per hour or faster the passenger compartment would be invaded. Thus it is not the snub-nose design per se which is claimed to be defective, but rather the lack of structural strength in the front panel.

Before discussing the propriety of granting a summary judgment, we need to address four controlling issues:

1. Does strict liability extend beyond a manufacturer to others in the chain of product distribution such as the defendant importer?

2. Does such liability encompass a design defect of the nature alleged here?

3. If so, what are the boundaries of that liability?

4. Was the alleged defect so open and obvious as to preclude recovery, *i.e.*, is assumption of the risk present?

Preliminary to the first issue, we note that the courts have struggled for a long time in their efforts to fit into traditional legal concepts the potential liability of sellers or suppliers of defective, injury-producing products. The notions of privity, implied warranties, inherently dangerous defects and ordinary negligence all crossed paths in these judicial efforts. Prosser, *The Assault Upon the Citadel*, 69 Yale L.J. 1099 (1960), and Prosser, *Strict Liability to the Consumer*, 18 Hastings L.J. 9 (1966).

Ultimately the legal fictions, traditional concepts and tortured reasoning were cast aside in Justice Traynor's landmark opinion in *Greenman v. Yuba Power Prods., Inc.*, 59 Cal. 2d 57, 62, 64, 377 P.2d 897, 27 Cal. Rptr. 697 (1963). The essence of the holding is contained in two sentences:

> A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. . . .

> . . .

> . . . To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the [product] in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the [product] unsafe for its intended use.

About the time of the *Greenman* opinion, the American Law Institute was drafting the Second Restatement of Torts. The rapidity of change in this area of the law is shown by the Institute's expansion of the strict liability

theory while it had various drafts under consideration. Tentative Draft No. 6 (1961) limited strict liability to food for human consumption. The theory was expanded the next year in Tentative Draft No. 7 (1962), to include any product intended for intimate bodily use. The final version, adopted in 1964, encompassed all products. It is contained in Restatement (Second) of Torts § 402A (1965), which provides in part:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby caused to the ultimate user . . .

While the influence of *Greenman* on the Restatement is apparent, *Greenman* appears to encompass a stricter degree of liability than section 402A. *Cronin v. J.B.E. Olson Corp.*, 8 Cal. 3d 121, 501 P.2d 1153, 104 Cal. Rptr. 433 (1972); *Clary v. Fifth Ave. Chrysler Center, Inc.*, 454 P.2d 244 (Alas. 1969).

We adopted the theory of section 402A in *Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 452 P.2d 729 (1969), as to a manufacturer, but expressly reserved the question whether it should apply to others in the chain of product distribution.

According to the Restatement, strict liability is applicable if *"the seller is engaged in the business of selling such a product"* even though "the user or consumer has not bought the product from or entered into any contractual relation with the seller." (Italics ours.) Restatement (Second) of Torts § 402A(1)(a) and (2)(b). Comment *f* states that the rule is intended to apply to any manufacturer, wholesale or retail dealer or *distributor*. Thus, such liability is extended to those in the chain of distribution.

Imposition of liability upon those in the business of selling or distributing a product, aside from the manufacturer, has been grounded upon several policy considerations. They are summarized and analyzed in 45 Wash. L. Rev. 431 (1970). Wholesalers and distributors have been held responsible under a strict liability doctrine in a number of

cases. *Barth v. B.F. Goodrich Tire Co.*, 265 Cal. App. 2d 228, 250, 71 Cal. Rptr. 306 (1968); *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill. 2d 339, 247 N.E.2d 401 (1969); *Keener v. Dayton Elec. Mfg. Co.*, 445 S.W. 2d 362 (Mo. 1969); *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). Dean Prosser concludes that

> Except in a state or two, there is now general agreement that it [strict liability] applies to a wholesale dealer, and to one at retail. All of the valid arguments supporting the strict liability would appear to have no less force in the case of the dealers . . . to justify giving the consumer the maximum of protection, and requiring the dealer to argue out with the manufacturer any questions as to their respective liability.

(Footnotes omitted.) W. Prosser, *Torts* § 100, at 665 (4th ed. 1971).

Clearly the defendant importer is within the chain of distribution and within the scope of liability under section 402A. We so hold.

The second issue is whether strict liability extends to a design defect. In holding that strict liability does encompass a design defect we join the prevailing, well reasoned majority of cases. *See*, for example, *Wright v. Massey-Harris, Inc.*, 68 Ill. App. 2d 70, 215 N.E.2d 465 (1966); *Higgins v. Paul Hardeman, Inc.*, 457 S.W.2d 943 (Mo. Ct. App. 1970); *Ginnis v. Mapes Hotel Corp.*, 86 Nev. 408, 470 P.2d 135 (1970); *Pizza Inn, Inc. v. Tiffany*, 454 S.W.2d 420 (Tex. Civ. App. 1970); W. Prosser, *Torts* § 99, at 659 (4th ed. 1971); *Pike v. Frank G. Hough Co.*, 2 Cal. 3d 465, 467 P.2d 229, 85 Cal. Rptr. 629 (1970); *Thomas v. General Motors Corp.*, 13 Cal. App. 3d 81, 88, 91 Cal. Rptr. 301 (1970): "Strict liability encompasses both design and manufacture."

■ A product may be just as dangerous and capable of producing injury whether its condition arises from a defect in design or from a defect in the manufacturing process. While a manufacturing defect may be more easily identified or proved, a design defect may produce an equally

dangerous product. The end result is the same—a defective product for which strict liability should attach.

The third and more difficult issue is a determination of the limits and boundaries of liability in a case like this. Plaintiff's action is premised upon an allegation that the claimed defect did not cause or contribute to the original collision, but caused enhanced injuries. Recovery for such theory was approved in principle in *Baumgardner v. American Motors Corp.*, 83 Wn.2d 751, 522 P.2d 829 (1974). Defendant contends, and correctly so, that *Baumgardner* did not answer all the problems which arise in a design defect case. In *Baumgardner,* the record had not reached a stage which disclosed to us whether the claimed defect was one of manufacture or design. Therefore we did not reach the matters raised by defendant which in essence require us to provide the criteria, definitions and limitations of liability raised by this record.

■ The doctrine of strict liability does not impose legal responsibility simply because a product causes harm. Such a result would embody absolute liability which is not the import of strict liability. Lascher, *Strict Liability in Tort for Defective Products* . . ., 38 S. Cal. L. Rev. 30 (1965); Wade, *Strict Tort Liability of Manufacturers*, 19 Sw. L.J. 5, 13 (1965).

Since we have adopted the theory of section 402A, it is the starting point for our analysis. The literal language of the section creates liability for a product in a *defective condition* which is *unreasonably dangerous*. The Restatement comments add flesh to these bare bone words. Under comment *g* entitled *"Defective condition"* it is stated:

> The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, *in a condition not contemplated by the ultimate consumer,* which will be unreasonably dangerous to him.

(Italics ours.)

> Comment *i*, entitled *"Unreasonably dangerous"* states:
> The article sold must be dangerous to an extent beyond that *which would be contemplated by the ordinary con-*

*sumer* who purchases it, with the ordinary knowledge common to the community as to its characteristics.

(Italics ours.)

These definitional concepts have spawned an avalanche of analysis, comment and criticism. Kessler, *Products Liability*, 76 Yale L.J. 887 (1967); Keeton, *Manufacturer's Liability: The Meaning of "Defect" in the Manufacture and Design of Products*, 20 Syracuse L. Rev. 559 (1969); Dickerson, *Products Liability: How Good Does a Product Have To Be?*, 42 Ind. L.J. 301 (1967); Calabresi and Hirschoff, *Toward a Test for Strict Liability in Torts*, 81 Yale L.J. 1055 (1972); Keeton, *Product Liability and the Meaning of Defect*, 5 St. Mary's L.J. 30 (1973); Rheingold, *What Are The Consumer's "Reasonable Expectations"?*, 22 Business Lawyer 589 (1967); Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825 (1973); Wade, *Strict Tort Liability of Manufacturers*, 19 Sw. L.J. 5 (1965); Notes, *Products Liability and Section 402A of The Restatement of Torts*, 55 Georgetown L.J. 286 (1966); Weinstein, et al, *Product Liability: An Interaction of Law and Technology*, 12 Duquesne L. Rev. 425 (1974).

Case law has adopted, modified or altered the Restatement definitions on several issues. Must a product be both defective and unreasonably dangerous? It has been held that the terms are synonymous, *i.e.*, that defective means unreasonably dangerous and has no independent significance. *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1087 (5th Cir. 1973); *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1272 (5th Cir. 1974).

In design defect cases, the Fifth Circuit has adopted the analysis of Dean Wade that in such cases the concept of defective condition is particularly inappropriate, has no independent meaning, is apt to prove misleading and it is better to not refer to any requirement of defectiveness. *Ross v. Up-Right, Inc.*, 402 F.2d 943 (5th Cir. 1968); Wade, *Strict Tort Liability of Manufacturers*, 19 Sw. L.J. 5, 15 (1965).

On the other hand, California has rejected the premise that the product must be unreasonably dangerous. In

*Cronin v. J.B.E. Olson Corp.*, 8 Cal. 3d 121, 501 P.2d 1153, 104 Cal. Rptr. 433 (1972), the court characterized the defect as one of design, although arguably it was one of manufacture. The court said at page 133:

> Of particular concern is the susceptibility of Restatement section 402A to a literal reading which would require the finder of fact to conclude that the product is, first, defective and, second, unreasonably dangerous. . . . We think that a requirement that a plaintiff also prove that the defect made the product "unreasonably dangerous" places upon him a significantly increased burden and represents a step backward in the area pioneered by this court.

> . . . We are not persuaded to the contrary by the formulation of section 402A which inserts the factor of an "unreasonably dangerous" condition into the equation of products liability.
> We conclude that the trial court did not err by refusing to instruct the jury that plaintiff must establish that the defective condition of the product made it unreasonably dangerous to the user or consumer.

A similar result was reached in *Glass v. Ford Motor Co.*, 123 N.J. Super. 599, 304 A.2d 562 (1973). However, Oklahoma has declined to follow *Cronin. Kirkland v. General Motors Corp.*, 521 P.2d 1353 (Okla. 1974).

Still another variation results from the Oregon formulation of the rule that the product must be "dangerously defective." *Phillips v. Kimwood Mach. Co.*, 269 Ore. 485, 525 P.2d 1033 (1974).

Other courts have followed the literal language of section 402A and require proof of a defective condition which is unreasonably dangerous. *Mather v. Caterpillar Tractor Corp.*, 23 Ariz. App. 409, 533 P.2d 717 (1975); *Kleve v. General Motors Corp.*, 210 N.W.2d 568 (Iowa 1973); *Jagmin v. Simonds Abrasive Co.*, 61 Wis. 2d 60, 211 N.W.2d 810 (1973).

If there is a requirement that the product be unreasonably dangerous, that concept necessitates definition. Comment *i* to section 402A dictates that it be dangerous to an

extent beyond that which would be contemplated by the ordinary consumer. Emphasis is on consumer expectation. This test has been modified by the Oregon court and several federal courts. In *Phillips v. Kimwood Mach. Co.*, *supra*, the court, as indicated, adopted a "dangerously defective" standard. It defined the test at page 1036, as follows:

> A dangerously defective article would be one which a reasonable person would not put into the stream of commerce *if he had knowledge of its harmful character.* The test, therefore, is whether the seller would be negligent if he sold the article *knowing of the risk involved.* Strict liability imposes what amounts to constructive knowledge of the condition of the product.

(Footnotes omitted.) This standard is in accord with the following federal cases: *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1088 (5th Cir. 1973); *Welch v. Outboard Marine Corp.*, 481 F.2d 252, 254 (5th Cir. 1973); *Helene Curtis Indus., Inc. v. Pruitt*, 385 F.2d 841, 850 (5th Cir. 1967), *cert. denied*, 391 U.S. 913, 20 L. Ed. 2d 652, 88 S. Ct. 1806 (1968); *Olsen v. Royal Metals Corp.*, 392 F.2d 116, 119 (5th Cir. 1968); *Dorsey v. Yoder Co.*, 331 F. Supp. 753, 759-60 (E.D. Pa. 1971).

The rationale is that this test is equivalent to the Restatement standard. The Oregon court said:

> That is to say, a manufacturer who would be negligent in marketing a given product, considering its risks, would necessarily be marketing a product which fell below the reasonable expectations of consumers who purchase it.

*Phillips v. Kimwood Mach. Co., supra* at 1037.

Other jurisdictions follow the Restatement and focus on consumer expectations. *Lunt v. Brady Mfg. Corp.*, 13 Ariz. App. 305, 475 P.2d 964 (1970); *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill. 2d 339, 247 N.E.2d 401 (1969); *Ginnis v. Mapes Hotel Corp.*, 86 Nev. 408, 470 P.2d 135 (1970). The test is not without criticism. *See* Fischer, *Products Liability —The Meaning of Defect*, 39 Mo. L. Rev. 339, 349 (1974); Keeton, *Manufacturer's Liability: The Meaning of "Defect"*

*in the Manufacture and Design of Products*, 20 Syracuse L. Rev. 559, 572 (1969).

It is apparent that we have a potpourri of theories and authorities from which to fashion our criteria, definitions and limitations. It is our opinion that the following principles best serve the pertinent policies in the balancing of the interests inherent in a strict liability design defect case.

■ If a product is unreasonably dangerous, it is necessarily defective. The plaintiff may, but should not be required to prove defectiveness as a separate matter.

Likewise, unreasonably dangerous implies a higher and different standard than what we conceive to be the intended thrust of section 402A strict liability. The emphasis is upon the consumer's reasonable expectation of buying a product which is reasonably safe. The ordinary consumer evaluates a product in terms of safety, recognizing that virtually no product is or can be made absolutely safe. Certainly that is the case with the automobile and all of its potential for injury.

Thus, we hold that liability is imposed under section 402A if a product is not reasonably safe. This means that it must be unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer. This evaluation of the product in terms of the reasonable expectations of the ordinary consumer allows the trier of the fact to take into account the intrinsic nature of the product. The purchaser of a Volkswagen cannot reasonably expect the same degree of safety as would the buyer of the much more expensive Cadillac. It must be borne in mind that we are dealing with a relative, not an absolute concept.

In determining the reasonable expectations of the ordinary consumer, a number of factors must be considered. The relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk may be relevant in a particular case. In other instances the nature of the product or the nature of the claimed defect may make other factors relevant to the issue.

■ Finally, defendant contends that the design of the microbus, and any defect, was open and obvious, precluding recovery. It is true that comment *n*, section 402A recognizes that assumption of the risk may be a defense in a strict liability case when it consists of voluntarily and unreasonably proceeding to encounter a known danger, *i.e.*, would a reasonably prudent person continue voluntarily to use a product in the face of a known, open and obvious danger? This was acknowledged in *Brown v. Quick Mix Co.*, 75 Wn.2d 833, 836, 454 P.2d 205 (1969):

> [T]he fact that a danger is patent does not automatically free the manufacturer from liability, but does so only if the plaintiff voluntarily and *unreasonably* encounters it.

*See,* Noel, *Defective Products: Abnormal Use, Contributory Negligence and Assumption of Risk*, 25 Vanderbilt L. Rev. 93, 119 (1972); *Strict products liability, defenses*, Annot., 46 A.L.R.3d 240 (1972). The alleged defect is not the snub-nosed design per se, but the lack of structural integrity in the front panel. Thus, we cannot say as a matter of law that the decedents voluntarily and unreasonably encountered a known danger.

Given the foregoing principles, it was error to grant defendants' summary judgment motion. Plaintiff, in opposition to the motion, submitted an affidavit by an engineer who stated that he specializes in auto crash studies. He concluded that the relative speed of the Volkswagen at the time of the collision was 20 miles per hour or less. Further, he stated that the front wall of the vehicle had no structural strength since there were in essence no reinforcing members. He stated that as a practical matter the vehicle had no protection forward of the passengers so that at any time the vehicle would slide into a solid object at 10 miles per hour or faster, the passenger compartment would be invaded and the occupants of the front seat would have to be hurt. He concluded that the vehicle was grossly unsafe and defective due to the lack of forward integrity.

That affidavit raised genuine issues of material facts.

The decision of the Court of Appeals is affirmed, the trial court is reversed and the matter remanded for trial.

STAFFORD, C.J., and FINLEY, ROSELLINI, HUNTER, HAMILTON, WRIGHT, UTTER, and HOROWITZ, JJ., concur.