[No. 12915-9-II.   Division Two.   September 17, 1990.]

DAVID W. AYERS, ET AL, *Appellants,* v. JOHNSON & JOHNSON BABY PRODUCTS CO., *Respondent.*

*Charles K. Wiggins* and *Edwards Sieh Wiggins & Hathaway; Elaine Houghton* and *Anderson Holman & Houghton,* for appellants.

*William J. Leedom, Mary H. Spillane,* and *Williams, Kastner & Gibbs,* for respondent.

WORSWICK, J.—Five–year–old David Ayers, by his guardian ad litem, and David's parents, Cheryl and Tom Ayers, appeal a judgment notwithstanding the verdict and an alternative order for a new trial in this products liability action. The jury awarded David $2 million and his parents $500,000 against Johnson & Johnson Baby Products Co. for permanent injuries David suffered when he drank Johnson & Johnson baby oil and then aspirated (inhaled) it into his lungs. We reverse and reinstate the verdict.

On the afternoon of April 23, 1985, David, then 15 months old, was playing in his family's home in Tacoma with his twin brother, Luke. The babies were not unattended; their father was home, their mother was preparing to go to work, and two of their sisters were also in the house. About a week earlier, one of David's sisters had poured some Johnson & Johnson baby oil from its original container into a smaller container to take to school for use on her hands after gymnastics and, as he played, David found it in her purse on the floor of her bedroom. Mrs. Ayers saw David just as he lifted the container to his mouth and began to drink the oil. She yelled at him to stop, and David may have gasped in reaction. Mrs. Ayers was relieved to learn that the liquid was baby oil because she thought the only effect from drinking it would be diarrhea. She looked at the original bottle to verify her understanding. Finding no warning, she instructed the older children to call her if any problems developed, and she went to work.

Later that evening, David began to have difficulty breathing. The family took him to Mary Bridge Hospital where an X–ray showed oil in his lungs. He was hospitalized in Tacoma and eventually sent to St. Louis to receive ECMO therapy, a special procedure that involves pumping the patient's blood outside his body and mechanically enriching it with oxygen. A side effect of this therapy caused cardiac arrest in David, and that led to brain damage. David cannot now move his arms or legs, cannot speak, suffers seizures, and is mentally retarded.

The Ayerses based this action on RCW 7.72.030(1)(b) and (3); RCW 7.72.030(1)(b) is one of the warnings provisions of the products liability act.[1] The verdict followed a 5–week trial.

The trial court granted Johnson & Johnson's motion for judgment n.o.v., holding that the evidence of causation was insufficient to sustain the verdict. The court also held that foreseeability was a necessary element of the claim, and that the evidence of this was insufficient also. Pursuant to

---

[1]RCW 7.72.030(3) applies both to design defect cases under RCW 7.72-.030(1)(a), and failure to warn cases under RCW 7.72.030(1)(b) and (c). RCW 7.72.030(1)(b) and (3) state:

(1) A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided.

. . . .

(b) A product is not reasonably safe because adequate warnings or instructions were not provided with the product, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate and the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate.

. . . .

(3) In determining whether a product was not reasonably safe under this section, the trier of fact shall consider whether the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer.

RCW 7.72.020 states: "The previous existing applicable law of this state on product liability is modified only to the extent set forth in this chapter." Therefore, prior product liability case law that is consistent with the act is still valid.

CR 50(c), the court also ordered a new trial, in the alternative, holding that there had been jury misconduct because the jury failed to vote separately on the issues of liability and damages. We hold that the evidence of causation was sufficient, foreseeability was not an element of the claim, and there was no jury misconduct.

In reviewing the judgment n.o.v., we must assume the truth of all the Ayerses' evidence and all reasonable inferences therefrom. *Rasor v. Retail Credit Co.*, 87 Wn.2d 516, 533, 554 P.2d 1041 (1976). The evidence must be considered in a light most favorable to the Ayerses. No discretion was vested in the trial court. Its ruling was proper only if, as a matter of law, there was no competent evidence, or reasonable inferences, to sustain the verdict. *Rasor*, 87 Wn.2d at 533–34. The verdict must, however, have been supported by substantial evidence. It cannot survive if founded on mere theory or speculation. *Hojem v. Kelly*, 93 Wn.2d 143, 145, 606 P.2d 275 (1980). This verdict passes these tests.

## CAUSATION

The Ayerses' burden on causation was to prove that, had they been adequately warned of the risks, they would have treated the product differently and avoided the harm. A manufacturer is liable "if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe . . . because adequate warnings . . . were not provided. . .". RCW 7.72-.030(1)(b). *See also Gosewisch v. American Honda Motor Co.*, 153 Ariz. 400, 737 P.2d 376, 379 (1987); *Laaperi v. Sears, Roebuck & Co.*, 787 F.2d 726, 730 (1st Cir. 1986).

Family members testified that house rules required that anything known to be dangerous be kept high out of reach of the twin baby boys. Mrs. Ayers testified that she was a label reader and that had she known of the risks of aspiration, everyone else in the family would have known also. Laurie Ayers, who left the purse containing the baby oil on

the floor, testified that Mrs. Ayers told all the family members to keep items known to be dangerous away from the boys. Laurie said that, never having been told of any risks associated with baby oil, she thought it was "no big deal" when she left her purse on the floor because there was nothing in it that could be harmful.[2]

Mr. Ayers also testified that products known to be dangerous were kept up on a top shelf out of reach. He testified further that had the product carried a warning of the risks, they would not have had it in the house.

An appropriate inference from all this is that because the product was without a warning, the family members did not know it was dangerous and so did not treat it as such. The family members' testimony shows that they did not know of the particular harm that could result from aspirating mineral oil. Their testimony raises the evidence above the "mere theory or speculation" cautioned against in *Hojem v. Kelly, supra.* Cf. *Baughn v. Honda Motor Co.,* 107 Wn.2d 127, 144, 727 P.2d 655 (1986) (when the harm that could have been warned against (danger of driving off–road trail bike on public roads) was *already known* to plaintiff and had in fact been warned against *by* him, to say he would not have bought bike had warnings been stronger is merely speculative).

---

[2]This act of leaving a purse on the bedroom floor raised in our minds the possibility that a defense analogous to independent, intervening cause might apply, even though Johnson & Johnson did not raise such a defense. However, under that doctrine, applicable in negligence cases, an intervening cause supersedes the defendant's negligence only if the intervening cause was not reasonably foreseeable; the intervening negligence of another must be so extraordinary or unexpected that it falls outside the realm of reasonably foreseeable events. *Smith v. Acme Paving Co.,* 16 Wn. App. 389, 396, 558 P.2d 811 (1976). Even under this standard, however, the intervening act of leaving the baby oil in the purse on the floor would not supersede Johnson & Johnson's fault in failing to warn. In fact, that failure contributed to the harm in that (1) Laurie had no way of knowing of the potential harm; and (2) the label on a bottle of baby oil at the time of the accident actually recommended adult use as a moisturizer, so its transference to another container to be carried in a purse was foreseeable. *See Smith,* 16 Wn. App. at 396.

Augmenting the family's testimony, several experts testified that mineral oil (baby oil is 99 percent mineral oil) poses special risks if aspirated. Dr. James Cunningham, a specialist in treating children's lung diseases, testified that mineral oil, a bland substance, "doesn't elicit as good a gag reflex or cough reflex from the upper airway as do many other substances." Dr. Robert Scherz, medical director of Mary Bridge Hospital, testified that, because of its lower viscosity, the lighter mineral oil from which baby oil is made spreads more rapidly and likely goes deeper into the lungs if aspirated than does thicker mineral oil.[3]

Dr. Scherz testified that in his expert medical opinion baby oil should bear warnings about diarrhea *and* aspiration. Dr. Marvin Scotvold, chief of dermatology at Children's Orthopedic Hospital in Seattle, strongly expressed the opinion that a baby oil container should carry a warning of the risks of aspiration.

█ Also, the Ayerses were not required to prove the exact wording of an adequate warning. The statute speaks only generally of "warnings . . . which the *claimant* alleges would have been adequate." RCW 7.72.030(1)(b). Nothing in the statute requires a plaintiff to prove explicit wording. Failure to warn liability and defective design liability are both created by RCW 7.72.030(1) and stand on the same footing. *See Falk v. Keene Corp.*, 113 Wn.2d 645, 652, 782 P.2d 974 (1989). Because plaintiffs in defective design cases

---

[3]Dr. Scherz's testimony on the impact of the lower viscosity of baby oil is significant because Johnson & Johnson admitted knowledge of the literature concerning the disease, lipoid pneumonia, that results from oil in the lungs. Usually that disease results when debilitated individuals are given mineral oil as a laxative. Dr. Scherz's point was that if the thicker, less easily spread mineral oil can cause the disease, then the thinner, more easily spread type used in baby oil can get into the lungs and cause harm. Moreover, it is indisputable common knowledge that babies will put into their mouths any object—or container—that comes to hand.

Opposing this sort of testimony, Drs. Richard Lemen and Barry Rumack testified for Johnson & Johnson that, in their opinions, mineral oil does not suppress the cough reflex or pose greater danger if aspirated than does any other liquid. Under the standard of review for judgment notwithstanding the verdict, however, we assume the truth of plaintiff's evidence.

are not required to show the existence of alternative safe designs (*Couch v. Mine Safety Appliances Co.,* 107 Wn.2d 232, 239, 728 P.2d 585, 78 A.L.R.4th 139 (1986)), it follows that the plaintiffs in a failure to warn case, involving identical liability principles, are not required to prove that a specific warning was required.

The family's and the experts' testimony provided sufficient evidence to create a jury issue on causation. It follows that the evidence was sufficient to support the verdict; the standards are the same. *Rasor,* 87 Wn.2d at 533–34; *Hollingsworth v. Washington Mut. Sav. Bank,* 37 Wn. App. 386, 389, 681 P.2d 845, *review denied,* 103 Wn.2d 1007 (1984).

### FORESEEABILITY

Because RCW 7.72.030(1) uses the term "negligence," the trial court apparently concluded that foreseeability of the harm to David Ayers was an element of the claim. The court went on to hold that the evidence of foreseeability was also insufficient. The court erred; foreseeability is not an element of a strict liability claim. *Kimble v. Waste Sys. Int'l, Inc.,* 23 Wn. App. 331, 336, 595 P.2d 569 (1979). Confusion caused by legislative tinkering should have been erased by now; liability under RCW 7.72-.030(1)(a) and (b) rests on traditional strict liability principles in which the concept of negligence plays no part. *Falk v. Keene Corp., supra.* Foreseeability is not an element of strict liability claims because the focus is not on the manufacturer's conduct, but on the expectations of the consumer. *Brown v. Yamaha Motor Corp.,* 38 Wn. App. 914, 691 P.2d 577 (1984). Thus, a jury is permitted to find liability based on strict liability but not negligence, and vice versa. *Davis v. Globe Mach. Mfg. Co.,* 102 Wn.2d 68, 684 P.2d 692 (1984); *Brown v. Yamaha Motor Corp., supra.*[4] Theories of

[4]As pointed out in *Couch,* 107 Wn.2d at 240 n.5, a negligence standard *is* adopted for the special category of failure to warn cases in which a manufacturer learns of a risk after a product is sold but fails then to supply warnings. (*Couch's* slight vagueness on this is cleared up in *Lundberg v. All–Pure Chem. Co.,* 55 Wn.

strict liability and negligence can, and frequently do, coexist; when they do, it is wrong to confuse them. *See, e.g.,* *Lockwood v. AC&S, Inc.,* 109 Wn.2d 235, 251, 254, 744 P.2d 605 (1987).

Although further discussion of the foreseeability issue is not necessary, we believe that a step–by–step application of the liability principles under RCW 7.72.030(1)(b) to the facts of this case will help in reducing even further the confusion that has arisen since enactment of the products liability act. First, the focus is on the product, and the question is whether the product is "not *reasonably* safe." The answer is found by balancing the likelihood that the product would cause the harm complained of (and the seriousness of that harm must be taken into account here) against the burden on the manufacturer in providing an adequate warning. In this case, that balancing involves the following factors: the product is called baby oil; it is for use on babies; it is described as "pure and gentle"; and it bears a label suggestion that it be used on baby's scalp, which, of course, is near both the mouth and nose. Although it may be unlikely that the product will cause harm of the gravity experienced here, nevertheless the seriousness of the risk is extremely great considering what mineral oil can do when aspirated. Notwithstanding Johnson & Johnson's protestations, plainly the jury was justified in finding that baby oil is a dangerous product that should have been accompanied by adequate warnings.[5]

---

App. 181, 185, 777 P.2d 15, *review·denied,* 113 Wn.2d 1030 (1989). The Ayerses' liability claim was not based on this special category.

*Lenhardt v. Ford Motor Co.,* 102 Wn.2d 208, 683 P.2d 1097, 40 A.L.R.4th 609 (1984) seems exemplary of the confusion following enactment of the products liability act. This confusion may have been engendered, in part, by RCW 7.72.050, which allows a limited focus on the manufacturer's conduct in limited circumstances involving adherence to industry and similar standards.

[5]Dr. Gordon Robinson, a human factors expert, testified that the then–existing label was almost the "opposite of a warning" because it perpetuated the "prior belief that the product is very safe, benign, that one needn't have any concerns for health and safety." He noted that the words, "pure and gentle" suggest there is no reason to be concerned when using the product.

One of the most serious of mineral oil's properties is its capacity to destroy the process by which the lungs rid themselves of foreign particles. Cells called macrophages surround a foreign substance in the lung whether it is milk, water, oil, or some solid substance, and carry it away from the lungs. The Ayerses produced testimony based on the literature concerning oils in the lungs that showed these macrophages cannot rid the lungs of oil. While the macrophages initially surround the oil, they cannot absorb it. The macrophages give up and release the oil back into the lungs. Given this potential for serious harm, the burden on Johnson & Johnson, essentially the cost of printing and affixing a warning label, seems light indeed.

■ The analysis does not stop here, however; we next must consider whether the product was unsafe beyond the expectations of the ordinary consumer.[6] Although a host of factors is considered in a design defect case (*see Lenhardt v. Ford Motor Co.,* 102 Wn.2d 208, 683 P.2d 1097, 40 A.L.R.4th 609 (1984)), we believe that only two factors need be considered in a failure to warn case: (1) nature of the product, and (2) deficiency of the warning. Here, the product was composed of an oil that has the potential for great harm if it gets into the lungs, but is nevertheless promoted for use on and around babies. The warning was not merely deficient, it was nonexistent.

The product carried no warning at all as to risks of either ingestion or aspiration. The jury was entitled to find that this product was unsafe beyond the reasonable expectations of the consumer, and that all elements of a strict liability claim had been established.

## New Trial Order

Having considered the affidavits of some jurors that the jury had not voted separately on the issues of liability and damages, the trial court granted Johnson & Johnson's

---

[6]The Supreme Court noted in *Falk v. Keene Corp., supra,* that by retaining this test, the Legislature retained the "buyer oriented" products liability approach that existed before the 1981 act. *Falk,* 113 Wn.2d at 653.

motion for a new trial in the event that this court reversed the judgment n.o.v. The court erred for two reasons.

■ First, after the verdict was announced, the jury was polled in open court. Ten jurors announced that the verdict was theirs. If the validity of the verdict is attacked because of the voting methods used in the jury room, the poll of the jury in open court validates the verdict. *Butler v. State,* 34 Wn. App. 835, 663 P.2d 1390, *review denied,* 100 Wn.2d 1009 (1983).[7]

■ Next, the alleged misconduct is the type that inheres in the verdict; it cannot be used to impeach the verdict. *Gardner v. Malone,* 60 Wn.2d 836, 841, 376 P.2d 651 (1962).

Here the jury was given a general verdict form, and another instruction told them to find each proposition, negligence, injury, and proximate cause. Its procedure for doing so inheres in the verdict. *Robinson v. Safeway Stores, Inc.,* 113 Wn.2d 154, 160, 776 P.2d 676 (1989) (juror affidavits may be relied on to establish misconduct but not to contest after the fact the thought processes involved in reaching a verdict). There was no juror misconduct in this case, and the jury's verdict was validated by the poll in open court.

Reversed and remanded with instructions to reinstate the verdict.

ALEXANDER, C.J., concurs.

REED, J. (dissenting)—I would affirm the trial court's judgment n.o.v. because, *inter alia,* I believe that, as a matter of law, a manufacturer has no duty to warn of a risk as unlikely as that involved here.

Beyond cavil, the risk in this case was exceedingly remote: from 1932 to the time of the accident in 1985, Johnson & Johnson had sold over 500 million bottles of

---

[7]The jury was given a general verdict form, proposed by Johnson & Johnson, whereas the Ayerses had proposed a more detailed verdict form that would explicitly have required separate votes on liability and damages.

baby oil without a single report of aspiration. To hold that *Johnson & Johnson* should have warned of a known, but exceedingly remote, danger not only is unfair and unwise, it simply ignores the language of RCW 7.72.030(1)(b), which reads as follows:

> A product is not reasonably safe because adequate warnings or instructions were not provided with the product, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate and the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate.

## STATUTE'S BALANCING TEST

The lack of a warning must be analyzed both in terms of the balancing required by RCW 7.72.030(1)(b), and the consumer expectations test of RCW 7.72.030(3). *Falk v. Keene Corp.*, 113 Wn.2d 645, 655, 782 P.2d 974 (1989). Although it is clear, as the majority notes, that the seriousness of the potential injury is extremely great, the test nevertheless requires balancing the likelihood and seriousness of the harm against the burden of preventing the harm through effective warnings. RCW 7.72.030(1)(b); *see also Falk*, 113 Wn.2d at 654.

While the majority pays lip service to the balancing test, it fails completely to consider likelihood when it states at page 295:

> Although it may be *unlikely* that the product will cause harm of the gravity experienced here, nevertheless the seriousness of the risk is extremely great considering what mineral oil can do *when aspirated.*

(Italics mine.)

Having accepted the "unlikelihood" of aspiration, the majority then purports to balance the seriousness of the harm against the burden of providing an effective warning. The majority states that the cost of printing and affixing a label would be small, but would it? The warning would have to be lengthy and complicated, warning the potential user not only that there is a risk of harm, but that children

who have aspirated baby oil may show no outward signs and that immediate medical attention is necessary to determine if aspiration occurred. Must aspiration also be explained?

> The unexamined premise that warnings are not costly in risk–utility balancing is, in our considered opinion, highly questionable. Warnings, in order to be effective, must be selective. They must call the consumer's attention to a danger that has a real probability of occurring and whose impact will be significant. One must warn with discrimination since the consumer is being asked to discriminate and to react accordingly. . . . Those who argue for warning as *the* judicial solution to latent defect cases labor under a naive belief that one can warn against all significant risks. The truth is that such a marketing scheme is not feasible. The warning process, in order to have impact, will have to select carefully the items which are to become part of the consumer's mental apparatus while using the product. Making the consumer account mentally for trivia or guard against risks that are not likely to occur imposes a very real societal cost.

(Footnote omitted.) Twerski, Weinstein, Donaher, Piehler, *The Use and Abuse of Warnings in Products Liability— Design Defect Litigation Comes of Age,* 61 Cornell L. Rev. 514–15 (1976); *see also Cotton v. Buckeye Gas Prods. Co.,* 840 F.2d 935, 938 (D.C. Cir. 1988).

We must, then, consider the possibility that individuals will overreact to a warning; that they will assume that the risk is much higher than truly it is; and that they will stop using a beneficial product because of a very remote risk. More importantly, we also must consider the possibility that consumers will pay less attention to all risks and all warnings because of the overload of information. In either event, the consuming public loses.

### THE CONSUMER EXPECTATIONS TEST

The majority's analysis of consumer expectations also ignores important considerations. The court should consider the cost of the product, the seriousness of the potential harm, and the cost and feasibility of minimizing the risk. "The nature of the product, or the nature of the claimed defect may make *other factors* relevant to the

issue." (Italics mine.) *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 154, 542 P.2d 774 (1975).

The majority, without explanation, chooses to discuss only the nature of the product and the nature of the defect and then concludes that the jury could have found that the product was not reasonably safe as judged by consumer expectations. The analysis is as follows:

> Here, the product was composed of an oil that has the potential for great harm *if it gets into the lungs,* but is nevertheless promoted for use on and around babies. The warning was not merely deficient, it was nonexistent.

(Italics mine.) Majority, at 296. But this begs the question by assuming that a nonexistent warning is deficient. The question is whether there was a need for *any* warning. To answer the question, we ask if the product is "unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer." *Tabert,* 86 Wn.2d at 154; RCW 7.72.030(3); *Falk,* 113 Wn.2d at 655.

> The ordinary consumer evaluates a product in terms of safety, recognizing that virtually no product is or can be made absolutely safe. . . .
>     . . . It must be borne in mind that we are dealing with a relative, not an absolute concept.

*Tabert,* 86 Wn.2d at 154. Could a reasonable consumer believe that defendant's baby oil is not reasonably safe after weighing factors such as the gravity of the potential harm, the cost and feasibility of eliminating or minimizing the risk and the nature of the product? I would answer, "no".

If one factors in the extreme unlikelihood of aspiration and the burdens of providing an effective warning, as discussed above, the scales tip even farther against the reasonableness of requiring a warning here. Therefore, I would hold as a matter of law that the baby oil without the warning was not unsafe beyond the reasonable expectations of the ordinary consumer.

Any other result is unfair because it punishes Johnson & Johnson for having a deep pocket, not for producing a product that presents an unreasonable risk of harm. Any

other result also is unwise, because it requires a manufacturer to warn against every conceivable danger, thus diluting the importance of any warning given.

### NEED FOR SPECIFIC WARNING

The majority also holds that the plaintiff need not offer the exact wording of a warning. The rationale is that because liability for failure to warn and for defective design both are created by RCW 7.72.030(1) and stand on the same footing, and because plaintiffs in defective design cases are not required to show the existence of alternative safe designs, *Couch v. Mine Safety Appliances Co.*, 107 Wn.2d 232, 239, 728 P.2d 585, 78 A.L.R.4th 139 (1986), it follows that the plaintiffs in a failure to warn case are not required to prove the specific warning that should have been given. I disagree.

However, RCW 7.72.030(1)(b) expressly provides that a product is not reasonably safe if, *inter alia*, "*the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate.*" The majority completely ignores this language. A jury cannot possibly decide if the manufacturer could have provided the warnings unless it is told what those warnings ought to have been. If the majority's approach is adopted, the manufacturer must prove a negative: that there is no possible alternative warning.

Without knowing the content of the alternative warning the trier of fact cannot balance the cost of providing this warning against the likelihood and severity of the danger. Understandably the Legislature has placed upon the plaintiff the burden of proposing alternative warnings; this court should not shift that burden in the guise of judicial construction of the statute.[8]

---

[8]It is conceivable that each individual juror had a different conception of the defendant's duty and of the particular type of warning that should have been given. This juror's view may or may not have agreed with that of any fellow juror. Thus, no rule of law can be extrapolated from the verdict.

In conclusion, the problem may be approached as either a question of a duty to warn or a question of legal causation.[9] The concepts, though not interchangeable, are closely related and bear consideration in tandem. *Hartley v. State,* 103 Wn.2d 768, 779, 698 P.2d 77 (1985); *see also* 1 *American Law of Products Liability 3d* § 4:4 (1987).

If the question is framed in terms of duty, it may be put as follows: Was the likelihood of aspiration together with the gravity of the harm sufficient to impose a duty on the defendant to guard against that danger? *See Berg v. General Motors Corp.,* 87 Wn.2d 584, 592, 555 P.2d 818 (1976); *see also Rose v. Nevitt,* 56 Wn.2d 882, 885, 355 P.2d 776 (1960). I would hold that the risk of harm in this case was insufficient to impose a duty upon Johnson & Johnson.

If the question is framed in terms of legal causation, it may be phrased as follows: Assuming that the plaintiffs proved the necessary elements of strict liability, should this court, as a matter of policy, determine that liability should attach? *See Hartley,* 103 Wn.2d at 779. I would answer that, as a matter of policy, the failure to warn should not be considered the legal cause of the injury.

In this regard, I must say that the majority's "foreseeability" discussion, pages 294–96, focusing on the product's "use on babies", the description "pure and gentle", and the "suggestions" that it "be used on baby's scalp, which, of course, is near both the mouth and nose" is a red herring— plain and simple. This tragedy did not happen because the product was being used in any of the ways intended or described. Rather, aspiration occurred because a teenaged sister broke house rules and (1) removed a tiny–apertured bottle from its safe place; (2) transferred the oil into a

---

[9]The question has been treated as one of foreseeability although the analysis remains a matter of "whether the event was likely enough 'to induce action to avoid it on the part of a reasonable mind.'" *Hentschel v. Baby Bathinette Corp.,* 215 F.2d 102, 106 (2d Cir. 1954), *cert. denied,* 349 U.S. 923 (1955), *quoted in* L. Frumer & M. Friedman, *Products Liability* § 2.22[3] (1989); *see also* L. Frumer & M. Friedman § 2.25[2].

widemouthed receptacle; (3) placed the unmarked container in her purse; (4) left the purse on the floor within reach of the baby and (5) left her door open. At this point, the mother, observing the child in the act of drinking from the bottle, cried out, producing a startled reaction of aspiration. How can it be said that but for defendant's failure to give some unspecified warning, this unfortunate accident would not have happened?

In my view, and for all the reasons outlined above, I would affirm the trial judge's granting of judgment n.o.v.

Review granted at 116 Wn.2d 1001 (1991).