[No. 25829-0-I.   Division One.   August 5, 1991.]

SUZETTE MARSHALL, ET AL, *Appellants,* v. WESTERN
AIR LINES, INC., ET AL, *Respondents.*

*Howard M. Goodfriend,* for appellants.

*Dennis Walters* and *Gregory C. Sisk,* for respondents.

WEBSTER, A.C.J. — Suzette Marshall appeals from a summary judgment in favor of Western Air Lines that dismissed with prejudice her personal injury claims. Marshall contends that a reasonable juror could have inferred negligence on the part of Western Air Lines under the theories of res ipsa loquitur and breach of a duty to warn. We affirm.

### FACTS

On October 11, 1984, Marshall was returning to Pasco from Idaho Falls on Western Air Lines flight 225 aboard a Boeing 737. Marshall, age 30, had flown previously and had never experienced any problems. She contended that a sudden change in cabin air pressure occurred on the last leg of the flight, between Boise and Pasco. She felt extreme suction, then spinning, nausea, and extreme confusion. She grabbed her head and tried to orient and compose herself. She called for a flight attendant, but no one responded. Marshall stated other passengers were exclaiming aloud and she recalled a "general feeling of something [not being] quite right". Marshall presented no evidence, however, that other passengers had noticed a

change in cabin air pressure. Marshall did not recall any announcements during the incident, but she did recall an earlier announcement about possible air turbulence. All of the crew members aboard Marshall's flight uniformly declared that "there was no sudden or unusual loss of cabin pressure during the flight in question, and no unusual event of any kind."

When the plane landed, Marshall was unsure whether she could stand up or walk by herself. A flight attendant eventually assisted her off the plane. Marshall told the flight attendant that she was sick and felt enormous pain and pressure in her head. The flight attendant remarked that Marshall was probably "air sick", and that she "wasn't the only one who had gotten sick on the flight." Marshall sat in the baggage claim area for a long time, trying to focus hard enough to keep her vision straight. She considered going to the hospital. Eventually, she was able to retrieve her suitcase and roll it to her truck in the airport parking lot. Marshall did not think she could drive to her home from the airport, so she practiced driving around the airport access roads before picking up her children at a friend's house. Marshall told her friend that something had happened on the flight and that she felt sick.

Marshall's symptoms did not go away. She continued to have spinning sensations and could barely even walk. She spoke to her family doctor about her symptoms. The doctor looked at her ears but did not see anything out of the ordinary. Marshall's doctor told her to call him if she did not improve in a couple of days. Marshall's condition worsened; besides being dizzy, she could not stand, eat, or sleep. Her husband had to drive her to the doctor. The doctor thought Marshall might have an inner ear infection and prescribed an antibiotic.

Several weeks after the flight from Idaho Falls, Marshall went to the emergency room with symptoms of vertigo, nausea, vomiting, and diarrhea. The two physicians who examined Marshall both noted that she had

complained of an unusual pulsing sensation in her ear, and approximately 1 week later, experienced "subjective vertigo" with "nausea, vomiting, and diarrhea."

Approximately 8 months after the flight, Marshall was treated by Dr. John Lindgren, an ear specialist and clinical instructor in otolaryngology at the University of Oregon Medical Center. Dr. Lindgren performed exploratory surgery and found a perilymph fistula, or a rupturing of the round window membrane between the middle and inner ear. Despite two surgeries, Marshall's condition has not markedly improved. Her lifestyle remains restricted, at least in the sense that she cannot fly in an airplane or drive anywhere involving a change of altitude.

Dr. Lindgren testified that, in his opinion, the fistula resulted from a change in cabin pressure occurring on the October 11, 1984, Western Air Lines flight, which would have caused a pressure differential between the middle and inner ear. He based his opinion on Marshall's statements to him indicating that her symptoms began during the flight. He also stated that Marshall's 1980 and 1981 hospitalizations for abdominal pain, nausea, vomiting, and diarrhea had no connection with the inner ear rupture she suffered on October 11, 1984. Lindgren testified that although Marshall was diagnosed during both hospitalizations as having "labyrinthine dysfunction", or dysfunction of the inner ear, with secondary "vertigo" and "disequilibrium", the primary diagnosis on both occasions was "irritable bowel syndrome." Dr. Lindgren did not believe that Marshall's symptoms in 1980 and 1981 were labyrinthine in nature. He stated that the workup notes and hospital charts did not support a diagnosis of an inner ear dysfunction. In his opinion, Marshall's dizziness resulted from her dehydration and her medication.

On cross examination, Dr. Lindgren described perilymph fistula as a "rare condition", and stated that it could be rare either because the individuals developing it are anatomically different, or because the environmental circumstances causing a fistula are rare. He agreed that

the majority of persons having problems with their ears on airplane flights have middle ear problems. He conceded that, based on current knowledge of the way perilymph fistulas occur, a reasonable explanation would be that Marshall is anatomically different from the average person. He had no way of knowing, however, whether Marshall was physiologically different.[1]

Captain James Seighle, a former pilot and flight instructor, examined the flight reports for the plane upon which Marshall flew. Seighle, an expert witness for Marshall, stated that the plane's pressurization system had not been operating correctly for at least 5 months before Marshall's flight. Based on this fact, he concluded that the pressurization system was "operating erratically" at the time of Marshall's flight, "so as to result in excessively large rates of change of the aircraft cabin pressure."

Bernard O'Doherty, an electromechanical engineer who served as an expert for Western Air Lines, also examined the flight reports. He stated, and the reports indicate, that there were no problems with the plane's pressurization system in connection with Marshall's flight, or the seven flights before and the seven flights after Marshall's flight. He stated the pressurization problems logged on the flight reports were typical entries and that none of the problems recorded could have caused an abnormal, sudden change in cabin pressure. Additionally, he pointed out that all of the problems had been resolved prior to Marshall's flight. First, the five entries made from May 14, 1984, to June 17, 1984, described problems with the "#1 engine pneumatic pressure regulator valve". The records indicate that the valve was replaced on July 17, 1984, and that no further problems in connection with the valve occurred. Second, there were five entries from September 21, 1984, to October 8, 1984, describing problems with the "outflow valve". O'Doherty contended that the

---

[1] Dr. Lindgren also acknowledged that a perilymph fistula may result from other activities involving pressure or elevation changes, such as scuba diving, and could also result from straining types of activities or head injuries.

first four of the five entries resulted from an "oversensitive feedback potentiometer, which caused the outflow valve to fluctuate very slightly." He contended that no problems with this instrument occurred after October 2, and that the entry made on October 8 concerned a "faulty #1 engine pneumatic pressure regulator valve". The records indicate that this valve was replaced on that same day. Marshall asserted that, even though no pressure problems appeared in the records on the day of her flight, a sudden loss of cabin pressure would not necessarily be noted on the flight logs or maintenance records. She based this assertion on Seighle's statement indicating that federal aviation regulations do not necessarily require notation of a sudden change of air pressure on the flight reports and on evidence that the automatic warning system designed to notify the crew of a sudden change in cabin pressure would only be activated if the cabin pressure changed dramatically at an altitude above 14,000 feet.

Marshall also argued that Western Air Lines should have warned her and other passengers about the possible effects of pressure changes and the precautions they could take to protect their ears. She asserted that the airline industry has known for years of the physical problems caused by pressure changes on aircraft, ranging from minor discomfort to a rupture of the ear. She presented evidence that student pilots must undergo chamber rides to determine whether they are physiologically capable of adjusting to pressure changes; those who are incapable of adjusting are disenrolled. Flying with a head cold can lead to temporary, and in some cases irreversible, ear maladies, and at least one airline has recommended that its employees not fly if they have a cold. Passengers with colds or allergies which make them more susceptible to ear damage could prevent pressure differential by using a nasal decongestant. Moreover, simple precautions such as chewing gum, yawning, and blowing gently with a pinched nose can release pressure in the ears. These

precautions were set forth in the Western Air Lines flight attendant manual. During Marshall's flight on October 11, Western Air Lines did not issue any warning to its passengers about pressure changes, except to inform them that oxygen masks would appear in the case of rapid decompression.

Dr. Lindgren testified that if Marshall had attempted and had been successful in equalizing the pressure in her ear before the perilymph fistula occurred, the injury would not have occurred. He was unable to conclude, however, that Marshall could have prevented her perilymph fistula. Instead, he indicated that she could have prevented the injury if there were "a sufficient time interval between the time she first felt some pressure until she felt the pop and the dizziness". In Marshall's deposition, she stated only that she felt a sudden change in cabin pressure, and then "extreme suction" and "spinning".

Marshall filed suit against Western Air Lines, alleging that it negligently caused an excessive change in cabin air pressure, which resulted in injury to her inner ear. She also alleged that Western Air failed to warn its passengers of the risks associated with sudden changes of air pressure in air travel and of the preventative measures passengers can take to relieve pressure in the ear. Western Air Lines moved for summary judgment, arguing that there was no evidence of a sudden, abnormal loss of cabin pressure, and that Marshall's injury resulted from a preexisting condition that may have been aggravated by normal fluctuations in air pressure on a commercial flight. On February 19, 1990, the trial court entered an order of summary judgment dismissing Marshall's claims with prejudice.

DISCUSSION

■ ■ A court shall grant summary judgment if, and only if, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The appellate court reviews the summary judg-

ment de novo, performing the same inquiry as the trial court. *Herron v. Tribune Pub'g Co.*, 108 Wn.2d 162, 169, 736 P.2d 249 (1987). In order to successfully resist summary judgment, the party bearing the burden of proof at trial must present evidence sufficient to establish the essential elements of its case. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). The court must assume the truth of the nonmoving party's evidence and all reasonable inferences therefrom. *Ayers v. Johnson & Johnson Baby Prods. Co.*, 59 Wn. App. 287, 291, 797 P.2d 527 (judgment n.o.v.), *review granted*, 116 Wn.2d 1001 (1990).[†] When reasonable minds can reach only one conclusion from the evidence presented, then "questions of fact may be determined as a matter of law, and summary judgment is appropriate." *Central Wash. Bank v. Mendelson-Zeller, Inc.*, 113 Wn.2d 346, 353, 779 P.2d 697 (1989).

■ ■ We first consider whether the trial court erred in granting summary judgment under the theory of res ipsa loquitur. The parties do not appear to dispute that Western Air owed a high degree of care for the safety of its passengers, and accordingly, had a duty to prevent the occurrence of sudden, abnormal changes in air pressure. If Western Air Lines breached that duty, then it may be liable for Marshall's injuries, even though she may have had an unknown preexisting condition. Marshall seeks an inference that a sudden change in air pressure caused her ear injury. In order to invoke the doctrine of res ipsa loquitur, the plaintiff must prove the following elements:

> (1) [T]he accident or occurrence producing the injury is of a kind that ordinarily does not happen in the absence of someone's negligence, (2) the injuries are caused by an agency or instrumentality within the exclusive control of the defendant, and (3) the injury-causing accident or occurrence is not due to any voluntary action or contribution on the part of the plaintiff.

---

[†]Reporter's Note: The Supreme Court affirmed the decision of the Court of Appeals at 117 Wn.2d 747 (1991).

*Adams v. Western Host, Inc.*, 55 Wn. App. 601, 605, 779 P.2d 281 (1989) (quoting *Zukowsky v. Brown*, 79 Wn.2d 586, 593, 488 P.2d 269 (1971) (quoting *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.*, 62 Wn.2d 351, 359, 382 P.2d 518 (1963))). The res ipsa loquitur doctrine permits the event or occurrence producing the injury to circumstantially establish prima facie negligence on the part of the defendant. *Jackson v. Criminal Justice Training Comm'n*, 43 Wn. App. 827, 829, 720 P.2d 457 (1986). Whether the court applies the res ipsa loquitur doctrine is a matter of law. *Jackson*, at 829. The standard of proof guiding the court's decision whether to invoke the doctrine of res ipsa loquitur is whether a "reasonable inference of negligence" exists based on an analysis of the above elements. W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 40, at 261 (5th ed. 1984). If the plaintiff demonstrates that it is entitled to rely on the res ipsa loquitur doctrine, then the defendant is entitled to summary judgment only if the evidence presented by the defendant destroys all reasonable inferences of negligence. *See Prosser and Keeton on Torts*, at 261; *Central Wash. Bank*, at 353.

In *Calabretta v. National Airlines, Inc.*, 528 F. Supp. 32 (E.D.N.Y. 1981), the court stated that the first element of the res ipsa loquitur formulation is satisfied if, "in the abstract," there is a "reasonable probability" that the incident would not have occurred in the absence of negligence. *Calabretta*, at 35, *cited in Prosser and Keeton on Torts* § 39 n. 56. The *Calabretta* court concluded that ear damage associated with an airplane flight ordinarily does not occur absent negligence. *Calabretta*, at 35. In the instant case, we believe that a sudden, abnormal change in cabin air pressure is the type of event that does not ordinarily happen in the absence of negligence.

We believe, however, that an implied requirement of the first element is that the "accident or occurrence" alleged to have produced the injury actually occurred. In the typical case the parties do not dispute the occurrence

of the event alleged to have produced the injury. *See generally Prosser and Keeton on Torts* § 39. If the court cannot say within reasonable probabilities that the alleged injury-producing event occurred, then the doctrine of res ipsa loquitur cannot be invoked to create an inference of negligence. *See Jackson,* at 830.

Western Air Lines asserts that it rebutted any reasonable inferences of negligence based on its evidence demonstrating that a sudden, abnormal loss of air pressure could not have occurred. In the instant case, the only direct evidence of a sudden, abnormal change in air pressure is Marshall's testimony. Captain Seighle's opinion that the problems documented in the flight and maintenance records demonstrate that the plane's pressure system was operating erratically during the flight is no more than a speculative hypothesis. In contrast, the statements by a Western Air Lines expert — that the noted pressurization problems were repaired by the time of Marshall's flight, and that no pressurization problems whatsoever occurred during Marshall's flight, or the seven flights before and after her flight — are supported by the flight and maintenance records. Marshall's proposition that a sudden, abnormal change in cabin air pressure would not necessarily be noted in the flight logs is only remotely supported by Seighle's statement and is not supported by any direct evidence. Moreover, the alleged sudden change of air pressure went unnoticed by everyone except Marshall. Based on these facts, a reasonable person would be unable to conclude that a sudden, abnormal change in air pressure occurred. Thus, Marshall has failed to prove the first element.

The second res ipsa element addresses whether the defendant, as opposed to someone else, had control over the instrumentality alleged to have caused the injury. *See Prosser and Keeton on Torts* § 39, at 248. In the case at bar, pressurization changes aboard Marshall's aircraft were under the control of the individuals working for Western Air Lines. Thus, the second element is satisfied.

With the advent of comparative fault, the third element has little relevance and is generally merged into the second element. If the event producing the injury resulted from the plaintiff's negligence, as opposed to the defendant's, and a reasonable inference of negligence on the part of the defendant does not exist, then the plaintiff may not rely on the res ipsa loquitur doctrine. Note, however, that application of the res ipsa loquitur doctrine is not precluded in situations in which the defendant had a duty to protect the plaintiff from harming himself. *Prosser and Keeton on Torts*, at 254. In the instant case, there is no allegation of negligence on the part of Marshall in connection with a sudden, abnormal change in air pressure. Western Air Lines' argument that the third element of the res ipsa loquitur doctrine has not been satisfied based on Marshall's preexisting condition is misplaced.

In view of our conclusion that a reasonable person would be unable to find that a sudden, abnormal change in air pressure occurred, we hold that Marshall was not entitled to invoke the res ipsa loquitur doctrine, and that the trial court did not err in granting summary judgment in favor of Western Air Lines.

Although Western Air Lines has presented evidence suggesting that Marshall had a preexisting condition that was simply aggravated by normal changes in air pressure, it has not demonstrated in medical terms that an abnormal change in cabin air pressure could not have caused or aggravated her injury. Therefore, summary judgment on the causation element would have been inappropriate.

We next address whether the trial court erred in granting summary judgment under the theory that Western Air Lines breached a duty to warn its passengers. Marshall contends that, even if the pressure change that precipitated her injury was a normal pressure change, Western Air Lines owed a duty to its passengers to warn them in advance of the risks of ear injury associated with ordinary

pressure changes.[2] The testimony of Marshall's doctor and the article entitled "The Newest Fear of Flying: Ear Damage" indicate that flying can cause a temporary, middle ear affliction called "aerotitis". In rare circumstances, normal cabin pressure changes may result in irreversible damage to the inner ear. As Marshall's doctor testified and as the article indicates, a reasonable hypothesis is that irreversible ear injuries occur among individuals who are particularly susceptible because of a head cold, for example, or because they are anatomically different from the average person.

■ In *Sprayregen v. American Airlines, Inc.*, 570 F. Supp. 16 (S.D.N.Y. 1983), the plaintiff sued the airline for his hearing loss on the theory that the airline should have informed him of the hazards of flying with a head cold. The court reasoned that, although an airline owes its passengers the duty of exercising the highest degree of care for their safety, developing a practical means of preventing an injury that is not likely to be suffered by the average, fit passenger would be extremely difficult. *Sprayregen*, at 17. *See also Arango v. Guzman Travel Advisors*, 761 F.2d 1527, 1536 n.10 (11th Cir.), *cert. denied sub nom. Arango v. Compania Dominicana de Aviacion*, 474 U.S. 995 (1985). The court concluded that an airline has no general duty to warn of hazards associated with a passenger's particular condition. *Sprayregen*, at 18. In the instant case, the only type of warning that might have helped Marshall is a notice before the flight that a very small percentage of individuals, for a variety of reasons, may suffer permanent ear damage due to normal air pressure changes. Based on *Sprayregen*, Western Air Lines had no duty to warn Marshall.

---

[2] The parties also make assertions of a duty to warn during the flight; however, such a warning would not have prevented the injury under the facts of this case. Dr. Lindgren stated that Marshall might have been able to prevent the injury if there was a "sufficient time interval between the time she first felt some pressure until she felt the pop and the dizziness". However, Marshall's testimony indicates that she did not experience any time interval.

Even if Western Air Lines had a duty to warn Marshall, her claim would fail on the causation element. There is no evidence whatsoever that a warning in advance of the flight would have prevented the injury that Marshall suffered. Indeed, Marshall testified that she was not aware of any inner ear problems, and that she had flown previously without experiencing any problems. Thus, Marshall's claim on the theory of duty to warn was properly dismissed.

The judgment is affirmed.

SCHOLFIELD and PEKELIS, JJ., concur.

Review denied at 118 Wn.2d 1002 (1991).